# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-2572

ERMAND HYSI and MIRELA HYSI,

*Petitioners,*

*v.*

ALBERTO R. GONZALES,[1]

*Respondent.*

———————

On Petition for Review of an Order of
the Board of Immigration Appeals.
No. A 75 320 668 and No. A 75 320 670

———————

ARGUED JANUARY 13, 2005—DECIDED JUNE 15, 2005

———————

Before ROVNER, EVANS and SYKES, *Circuit Judges.*

ROVNER, *Circuit Judge.* Ermand Hysi ("Hysi") and his wife, Mirela, are citizens of Albania. Hysi overstayed his visa while visiting the United States and Mirela arrived here without any valid entry documents. When the Immigration and Naturalization Service ("INS") began

———————

[1] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), we have substituted the current Attorney General of the United States, Alberto R. Gonzales, for his predecessor as the named respondent.

proceedings to remove them, Hysi sought asylum, with-holding of removal under the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment ("Convention Against Torture"), and in the alternative, voluntary departure. Mirela's claims are derivative of Ermand's and thus the focus of the appeal is exclusively on Ermand Hysi's claims. An Immigration Judge ("IJ") found that Hysi lacked credible evidence to support his claims and therefore denied Hysi's applications for asylum and withholding of removal as well as his request for voluntary departure. Instead, the IJ ordered the removal of Ermand and Mirela Hysi to Albania. The Board of Immigration Appeals ("BIA") summarily affirmed the IJ's decision and we now affirm as well.

## I.

Hysi arrived in the United States in late November 1996 as a non-immigrant visitor with authorization to remain here until June 14, 1997. Rather than leaving at the appointed time, Hysi remained and in July 1997, he filed an application for asylum with the INS. The INS referred the application to the immigration court and charged Hysi with removability as an alien who remained in the United States for a time longer than permitted. *See* 8 U.S.C. § 1227(a)(1)(B). At a preliminary hearing, Hysi admitted the factual allegations against him and conceded that he was removable. He petitioned the court for asylum, withholding of removal under the Convention Against Torture and, in the alternative, voluntary departure.

The IJ held a hearing at which Hysi presented testimony, documentary evidence and an expert witness in support of his claims. Hysi testified that his family opposed the communist regime in Albania, and that after democratically-elected President Berisha came into power, he went to work for the Berisha government. His job involved filing and

archiving documents, and maintaining the personnel files of people working for the administration. He also managed employees with housekeeping, cleaning and utilities duties. Hysi believed that people who had worked for the communist regime should not be hired to work in the Berisha-led government, but his manager disagreed. Hysi had other conflicts with his manager and was fired from his job in 1996 due to, he claims, his outspokenness.

Hysi testified that he filed a complaint seeking to get his job back but that complaint was reviewed by the same person who had fired him and thus was denied. He then filed a complaint with the High Court of Albania that was also denied. Hysi did not retain copies of these complaints and thus had no documentary evidence to support this part of his account. In addition to his job with the Berisha administration, Hysi worked about once a month on a committee responsible for returning to the original owners land and property that had been seized by the communist regime. Hysi's job was to review claims for property, verify which claims were legitimate and then recommend to the committee chairman whether the property in question should be returned to the claimant. Hysi averred that he was unable to help anyone retrieve their property because the committee chairman would instead give the property to people who paid bribes or were high ranking government officials. After he lost his job with the Berisha administration, Hysi was also removed from the committee.

In January 1996, after losing both positions, Hysi stated that he went to work for the Right Democratic Party (known in Albania as the "PDD") and also became a member. In conjunction with the PDD, Hysi was paid to write articles for publication. Hysi claimed he wrote articles that criticized the Democratic Party and as a result he was physically attacked. In late May 1996, he testified, four men kidnaped him, took him to a mountain and beat him. He believed the men worked in the Berisha administration.

According to Hysi, the men warned him that if he continued to speak or write against the Democratic Party, he would be "in a lot more trouble." Hysi testified that he was beaten into unconsciousness by these men and that passersby later helped him return home. He did not seek medical attention for his injuries.

After this attack, Hysi testified, he visited the United States. During his stay here, he wrote two political articles which discussed the manipulation of upcoming Albanian elections by the Democratic Party and the Socialist Party. He faxed these articles to Albania where they were published in two different newspapers in August 1996. Hysi testified that these two newspapers were both published by PDD members and that the publication of his articles in these newspapers proved his membership in PDD. Hysi testified that he lost all of his identification cards when he lost his wallet on the airplane during his trip to the United States in November 1996 and thus his only proof of membership in PDD was the two articles published in PDD newspapers. He submitted these articles in support of his application for asylum. He testified that, although he wrote other articles about the government, he submitted these two with his application for asylum because he thought these were "the only ones that have to do with the case." Tr. at 150. He confirmed, when asked, that none of his other articles had caused him problems with the government.

Hysi testified that he returned to Albania in September 1996 and that in October of that year, he was interrogated and held in the prosecutor's office under the pretext that he had offended President Berisha. He was beaten and then released after being held two days. He nonetheless continued his political activities after this attack, but after the November elections, the same four men who had kidnaped him earlier, kidnaped him again. He testified that this time his attackers beat him and told him that if he continued his political activities he would be

"physically eliminated." He told the IJ that he required a one-week stay in a hospital after this beating, and he provided documentation of the hospital stay. After his release from the hospital, he and his family decided that it was best for him to return to the United States. At the end of November 1996, Hysi returned to the United States. After his departure from Albania, Hysi testified, his wife was pressured and threatened by people who told her that Hysi would be harmed if he returned to Albania. Although his wife could not say who these people were, she was frightened and decided to come to the United States as well. She arrived in the United States in August 1997.

On cross-examination, the INS questioned Hysi about the authenticity of the newspaper articles that were the center of his claim of persecution. The INS had the original prints of the articles that Hysi had submitted in support of his asylum claim, and the INS attorney pointed out that Hysi's name appeared to be in a different typeface than the rest of the article, and was printed in bold unlike other printing on the page. The IJ examined the newspapers and noted that parts of the paper containing Hysi's name were translucent but the rest of the newspaper was not. The INS attorney asked Hysi if his name had been stamped on the page after publication. Hysi's response to these discrepancies was that he was in fact the author of these articles. While the hearing proceeded, the IJ's law clerk attempted to verify the authenticity of the articles by contacting the Library of Congress and by searching the internet. At the close of evidence, the IJ returned to the issue because the clerk had been unable to verify the true author of the articles.

Hysi's counsel complained that the INS had these documents for a lengthy time without having them analyzed and suggested that the articles be submitted for evaluation. Hysi's lawyer pointed out that neither the attorneys present nor the IJ were experts who could determine the authenticity of Hysi's name on the newspapers. The IJ consequently

sent both newspaper articles to the INS Forensic Document Laboratory ("FDL") to determine whether they were forgeries. The IJ set the case for status six months hence, noting that she would not be present at that time:

> I don't anticipate that I'll be here, but I'm going to leave specific instructions for the next Immigration Judge, because I'm of the opinion that if in fact these documents are legitimate and the hospital document is found to be legitimate with no alterations, nothing fraudulent whatsoever about the document, I think that the respondent has met his burden in establishing eligibility for the relief requested. However, on the other hand, if anything whatsoever is found to be fraudulent about these documents, that taints the entire claim, and in that case, I don't think anything the respondent said can be believed, and it should be denied. And those are the instructions I'm going to leave the next Immigration Judge. Okay.

Tr. at 176-77.

In addition to his own testimony, Hysi presented an expert witness, Prenk Camaj, who testified that he had interviewed government officials in Albania regarding Hysi. Camaj testified that he spoke to the deputy chief judge of the Albania Supreme Court, the commander of presidential security for Albania during the Berisha administration, the general in charge of all of all departments related to security, and the minister of the interior. From these sources, Camaj learned that Hysi would be persecuted on his return to Albania because of the two articles he wrote about the Berisha government. He also testified that one of these sources told him that the government had a "very big file" on Hysi and that Hysi was "hunted" by security forces. Camaj was unable to verify the authenticity of the articles Hysi claimed to have authored but he noted the articles

were very critical of the Berisha government and that Hysi would be killed if he returned to Albania because of his political views.

Six months later, the parties returned to court on the status set by the IJ. As predicted, a new IJ presided, and Hysi was present and represented by substitute counsel, who was standing in that day for his regular attorney. After noting that the matter had been set for status based on a suspicion of fraud having been committed in the supporting documents, the IJ noted that she had received the report from the FDL indicating that someone had indeed tampered with both newspaper articles. The IJ indicated that she intended to issue a written decision based on this additional evidence, and asked Hysi's substitute attorney to tell his regular counsel the plan of action, noting that if a written decision was not the right course of action, she would "re-calendar" the case again. After asking Hysi's counsel whether there was anything further (he replied "No, Your Honor"), she closed the matter for written decision. Hearing nothing further from any of the parties, the IJ issued the written decision denying Hysi relief approximately five months later.

In the written decision, the IJ noted the FDL's conclusion that the newspaper articles were fraudulent. The FDL examiner remarked that the author attributions accompanying the questioned articles were added to the newspapers after the papers were printed. The examiner opined that the process used to insert the author name after the fact resulted in the text being indented into the surface of the page unlike the other text printed on the page. In addition, the examiner concluded that, for one of the newspaper articles, a previous entry was eradicated from the name area of the text, resulting in damage to the surface of the paper. Because of this forgery, the IJ found that Hysi failed to establish the underlying facts of his claim for asylum by a preponderance of credible, probative evidence. The IJ

found specifically that the use of fraudulent documents in making his claim seriously undermined Hysi's credibility and that Hysi failed to provide any convincing explanation for questions regarding the authenticity of the articles. The IJ noted that Hysi simply insisted that he wrote the articles and that they were genuine even when confronted with the obvious differences in typeface that were visible even to the untrained eyes of the IJ and the INS attorney. The IJ found that because the articles were fraudulent, Hysi's entire claim was suspect. Because Hysi lacked credible proof that he wrote the articles, the IJ discounted Hysi's claim that he suffered persecution on account of the articles. The only other mistreatment Hysi alleged was being fired from his job, which the IJ found was insufficient to establish persecution. The IJ gave minimal weight to the opinions of the expert witness because the expert had relied for many of his conclusions on Hysi's representation that he had written the articles and was known in Albania to be the author. Accordingly, the IJ denied Hysi's claim for asylum. The IJ similarly rejected Hysi's claim for withholding of removal, which has a more stringent standard than the asylum claim, and also denied his claim for relief under the Convention Against Torture, again for lack of credible evidence. The IJ found that Hysi was ineligible for voluntary departure and thus ordered that he and his wife be removed to Albania. Hysi appealed to the Board of Immigration Appeals, which affirmed, without opinion, the results of the decision below. Hysi then appealed to this court.

## II.

In his appeal, Hysi challenges the IJ's adverse credibility finding, arguing that the IJ erred because there was no evidence supporting a finding that he altered the newspaper articles and because his testimony was corroborated by the expert witness. Hysi also complains that the IJ improperly

accorded weight to a statement his counsel made to an INS attorney after the original hearing but before final status when the IJ closed the case for evidence. Because the BIA affirmed summarily, that is, without issuing a separate opinion, we review the decision of the immigration judge directly to determine if it is supported by substantial evidence. *Tolosa v. Ashcroft*, 384 F.3d 906, 908 (7th Cir. 2004); *Oforji v. Ashcroft*, 354 F.3d 609, 612 (7th Cir. 2003); *Georgis v. Ashcroft*, 328 F.3d 962, 966-67 (7th Cir. 2003).

**A.**

We will affirm the IJ's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). Only where the evidence in support of the application is so compelling that no reasonable fact-finder could fail to find the requisite fear of persecution will we reverse a decision for lack of evidence. *Elias-Zacarias*, 502 U.S. at 483-84; *Georgis*, 328 F.3d at 967. To qualify for asylum, Hysi bore the burden of showing that he suffered past persecution or has a well-founded fear of future persecution on account of his race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42)(A); *Ememe v. Ashcroft,* 358 F.3d 446, 450 (7th Cir. 2004). A petitioner's experience of past persecution gives rise to a rebuttable presumption that he will face future persecution. 8 C.F.R. § 208.13(b)(1)(i); *see, e.g., Oforji,* 354 F.3d at 613.

We give great deference to an IJ's credibility determinations so long as they are supported by cogent reasons that bear a legitimate nexus to the finding. *Tolosa*, 384 F.3d at 909. We will reverse an IJ's credibility findings only in extraordinary circumstances. *Tolosa*, 384 F.3d at 909. The IJ found that Hysi was not a credible witness because the FDL determined that the author attributions in the news-

paper articles were added after publication and, in one of the papers, other text had been erased from the author name area on the page before Hysi's name had been added on top of it. Because the newspaper articles were so central to Hysi's asylum claim and because the articles were altered, the IJ declined to believe Hysi's testimony.

This is not a case involving extraordinary circumstances. The heart of Hysi's claim is that he published two newspaper articles critical of the Berisha government and that as a result of these articles, he was detained, interrogated and beaten. He claims that because he continued his political activities after this initial detention and beating, he was kidnaped, beaten again and threatened that he would be "physically eliminated" if he continued his political activities. Moreover, Hysi relies on the articles as proof of his membership in the PDD. Indeed, Hysi testified that the articles were the only evidence he had of his membership in the PDD, having lost his identification cards while traveling to the United States. If Hysi did not, in fact, publish these two articles, the very articles that he testified were the only ones relevant to his claim, then he would be hard pressed to argue that the government persecuted him because of the articles. Moreover, if the articles were fraudulent, the only remaining proof of Hysi's membership in PDD is Hysi's own testimony. The IJ was entitled to infer that Hysi or someone acting on his behalf altered the articles, and that the articles were altered because they would not have supported Hysi's claim in their original form. Adding or changing the author attribution impugned Hysi's credibility on an issue central to his claim. The IJ was therefore entitled to discount his remaining testimony as well.

Hysi argues that other evidence in the record supports his claim that he was persecuted because of his political beliefs and activities. He points to his expert witness, Camaj, who testified that he interviewed government officials in Albania who verified that Hysi has a "very big file" with the

government and that he would be hunted by security forces and killed if he returned to Albania. The IJ reasonably discounted this testimony because it was based in part on the expert's belief that Hysi authored the articles in question and his belief that Hysi was known in Albania as the author of the articles. Hysi argues that although someone altered the newspaper articles, there is no evidence in the record that he is the person who committed the forgery and no evidence that he was not the author of the articles. Again, though, the IJ reasonably inferred that Hysi altered the articles he submitted to the INS. Hysi bore the burden of proving by a preponderance of the evidence that he suffered persecution because of his political beliefs. His argument that there is no evidence he did not author the articles is thus irrelevant. He bore the burden of demonstrating that he did author the articles that were the basis of the government's displeasure with him and he failed to establish this fact with credible evidence.

Finally, Hysi complains that he was not given an opportunity to rebut the report from the FDL. We reject this claim as well. First, at the hearing where Hysi was questioned about the authenticity of the articles, Hysi's own attorney agreed that the FDL was the appropriate entity to examine the articles. Hysi's counsel did not request an opportunity to have another expert provide an independent report. At the status hearing where the report was received into evidence, the IJ clearly told Hysi's substitute counsel that a written opinion would be issued unless she heard anything further from the parties. Hysi's lawyer did not ask for an independent examination of the documents then or at any time thereafter. Hysi cannot complain at this late date that he wished to hire an independent examiner to refute the FDL's conclusions about the newspaper articles, having foregone numerous opportunities to do so while the case was still before the IJ. We find no error in the IJ's conclusion that the author attributions for the newspaper articles

were fraudulently added after the fact. Because the articles were central to Hysi's claim that he was persecuted for his political views and membership in the PDD, the IJ was entitled to find that Hysi was generally not a credible witness. In short, the record evidence does not compel us to find the requisite fear of persecution and the IJ's conclusions are supported by substantial evidence. We therefore deny the Petition for Review of Hysi's asylum claim.

Having failed to meet the more lenient burden of proof for asylum, Hysi cannot establish that he is entitled to withholding of removal under 8 U.S.C. § 1231(b)(3) and 8 C.F.R. § 1208.16(c)(2). Nor can he establish eligibility for protection under the Convention Against Torture. *Ahmed v. Ashcroft*, 348 F.3d 611, 615 (7th Cir. 2003) (an applicant who fails to establish eligibility for asylum necessarily cannot satisfy the more stringent requirements for withholding of removal under 8 U.S.C. § 1231(b)(3), nor the requirements for withholding of removal under the Convention Against Torture). We thus deny the Petition for Review in its entirety.

## B.

After the initial hearing but before the IJ closed the case for evidence, the INS filed with the immigration court a "Notification of Alleged Perjury and False Information" ("Notification"). The Notification recounted that Hysi provided the INS with original copies of two newspaper articles when he applied for asylum and then submitted photocopies in support of his testimony at the hearing. The Notification stated that the IJ had submitted the original newspaper articles to the FDL after their authenticity was called into question during the hearing. Following that hearing, according to the Notification, the INS attorney encountered Hysi's counsel and reported the following:

> On April 12, 2002, I had a chance encounter with counsel for the respondent. Counsel informed me that I was "right on the money" about the articles in question. Specifically, he stated that the respondent informed him that he did not write the articles. Counsel further advised me that he did not have this knowledge prior to the respondent's confession.

R. at 416-18 (footnote omitted). Having notified the court about this conversation, the INS requested that the IJ take "appropriate action." In the IJ's opinion, she stated that because Hysi had not been given an opportunity to refute the allegations in the Notification, she would give the Notification "minimal weight." In his appeal, Hysi challenges whether the IJ could properly give *any* weight to the Notification without violating Hysi's due process rights because Hysi had no opportunity to cross-examine the INS attorney regarding the allegations. Hysi attached his lawyer's response to the Notification to his reply brief (Hysi's lawyer has an entirely different account of that conversation) and the government moved to strike it because it was not part of the record below. Curiously, the document bears the file stamp of the Department of Justice Executive Office for Immigration Review and is stamped with the date June 12, 2002, well before the IJ issued her opinion. Yet the government argues that this document is extra-record evidence that was not part of the administrative record. This is a mystery that we need not solve. In reviewing the IJ's decision, it is readily apparent that when the IJ said she would give the Notification "minimal weight," she meant "no weight." The IJ did not rely on the Notification at all in reaching her decision, relying instead on the report of the FDL in finding that Hysi lacked credibility. The mysterious response from Hysi's counsel thus becomes irrelevant. The IJ considered neither document and this court has given no weight to either document. The motion to strike is therefore denied as moot.

PETITION FOR REVIEW DENIED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*