NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued April 27, 2016
Decided May 24, 2016

**Before**

JOEL M. FLAUM, *Circuit Judge*

DANIEL A. MANION, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 15-2778

| | |
|---|---|
| BARSHAN ISLAM and FARHANA ISLAM, *Petitioners*, | Petition for Review of an Order of the Board of Immigration Appeals. |
| *v.* | Nos. A098-505-472 & A098-505-473 |
| LORETTA E. LYNCH, Attorney General of the United States, *Respondent*. | |

**ORDER**

Barshan Islam, a citizen of Bangladesh, petitions for review of the denial of his application for political asylum based on the persecution he faced because of his involvement with an opposition political party. Islam's wife, Farhana Islam, derivatively claimed asylum based on his application. An immigration judge found Islam's testimony to be not credible, and Islam now challenges this finding. Because the IJ's credibility determination is supported by substantial evidence despite a mistake in law, we deny the petition.

Islam and his wife entered the United States in March 2004 as visitors, overstayed, and seven months later Islam affirmatively applied for political asylum and withholding

of removal. In his application—which he prepared with the help of an attorney—Islam stated that he and his wife actively supported the Awami League, a political party that opposed the then-ruling party in Bangladesh, the Bangladesh Nationalist Party (BNP). Islam said that Awami League members in Bangladesh were "being brutalized and killed on an almost daily basis" by the BNP-controlled government, and that he and his wife feared for their lives if they returned. He did not, however, describe any mistreatment that he and his wife had personally faced in Bangladesh. In response to a question whether he or anyone in his family had ever been mistreated, he responded only that his father—a university professor and longtime member of the Awami League—had been imprisoned and tortured during the Bangladesh liberation war in 1971, and more recently that his father had received threatening telephone calls and was forced to resign from his position at the university. After a hearing, an asylum officer denied his application and referred the case to the Immigration Court in Chicago.

At a hearing before an IJ in June 2006, Islam (represented by new counsel) introduced a packet of new evidence in support of his request for asylum and withholding of removal. The evidence included his own written statement detailing his personal involvement with the Awami League in Bangladesh, including several assaults, beatings, detentions, and interrogations by police and BNP members. He also attached country reports, news articles, letters from his friends and family, and some of his father's academic works. After reviewing the new evidence, the IJ determined that Islam was bringing "an entirely new claim" for asylum. The IJ therefore administratively closed the case and remanded it to the asylum office to reevaluate his application. In January 2008, the asylum officer denied this second application, concluding that discrepancies between his written statement and his interview testimony undermined his credibility.

A final hearing eventually was held in September 2013, after which the IJ found Islam not credible and denied his asylum application. Islam testified at the hearing, repeating much of what he had said in his 2006 written statement. But the IJ discredited his testimony for two reasons. First, the IJ thought it significant that Islam had not described any mistreatment in his initial 2004 asylum application despite the extensive abuse he later alleged. And although in his 2006 written statement Islam tried to explain this omission by saying that he had been too afraid to tell his attorney or the asylum officer about the mistreatment,[1] the IJ rejected that excuse after Islam testified otherwise

---

[1] The nature of Islam's fear is puzzling. He did not, for example, say that he feared retribution at the hands of his persecutors if he told his attorney or the asylum

at the hearing in 2013, when he stated that he *had* told his lawyer about the past mistreatment. The second reason the IJ gave for discrediting Islam's testimony was the existence of several inconsistencies between his 2006 written statement and his 2013 hearing testimony, which, the IJ opined, showed that he was "not familiar with his prepared affidavit or the affidavit was completely inaccurate." In particular, the IJ noted the following discrepancies:

- In his 2006 written statement, Islam said that he had first been arrested during a student protest of the military dictator, General H.M Ershad, in 1990, but during the 2013 hearing he dated the protest and arrest as taking place in 1998.

- In 2006 Islam said that he had been arrested on March 14, 2004, that he had been held for two days while police questioned and tortured him, and that after his release he had been treated by a doctor. At the 2013 hearing he said that the arrest happened on March 10, 2004, that he had been held for only 24 hours, and that after his release he had been admitted to an in-patient clinic where he was treated by a doctor.

- In 2006 Islam described three significant events that he did not discuss at the 2013 hearing: a police beating at a sit-in in January 2002, a police beating at a hunger strike in March 2002, and the killing of his friend by the BNP in February 2003.

The IJ further noted that Islam had provided no evidence to corroborate his allegations of past mistreatment. Although he submitted several affidavits from family and friends, none of the statements mentioned any mistreatment. And when the IJ pointed out this omission to Islam at the hearing, he responded that he simply had not asked them to mention the incidents. But even if Islam's allegations were credible, the IJ continued, they were not specific or detailed enough to rise to the level of past persecution, especially without any documentary evidence to support his claims. And even if Islam could establish past persecution, the IJ found that the conditions in Bangladesh had materially changed since the time he left. Country reports from the U.S. State Department show that the Awami League had since regained power, and Islam provided no other evidence to show that he still faced danger.

---

officer about his past abuse. Rather, he said that he "feared that [he] would have to face removal from the USA if [his] arrest or suffering of violence was made known to the immigration authorities."

The Board of Immigration Appeals upheld the IJ's decision, finding no clear error in his credibility determination. Because the Board concluded that the adverse credibility finding was sufficient to deny the requests for relief, the Board did not address the IJ's additional findings. The Board did, however, identify one error of law: The IJ incorrectly applied the REAL ID Act of 2005 to Islam's asylum application. The IJ treated the renewed application that Islam filed in 2006 as a new application filed after the passage of the Act, but the renewed application merely supplemented the original application that he had filed in 2004 before the Act was passed. The Board did not believe that remand was necessary, however, because it determined that the IJ would have found Islam not credible even under the pre-REAL ID Act standard.

In his petition for review, Islam argues that the IJ's credibility finding is not supported by substantial evidence. First, he challenges the IJ's conclusion that his failure to allege any mistreatment in his initial asylum application conflicts with his later descriptions of the extensive abuse he experienced in Bangladesh. Islam argues that his later statements merely supplemented his original asylum claim. Moreover, he says that he did not give inconsistent explanations for the omission: As he explained in his written statement in 2006, he was afraid to disclose all of the incidents to his lawyer, and the Board "manipulated" his 2013 hearing testimony to conclude that he had said the opposite—that he *had* told his lawyer about the incidents. A more reasonable interpretation of his 2013 testimony, he says, is that he told his lawyer generally about the basis for his asylum claim, just not the details of the incidents.

But we conclude that Islam's omission of any mistreatment in his initial application is sufficient to support the IJ's adverse credibility finding. Although "initial asylum applications should not always be considered completely reliable, particularly when filled out without the assistance of counsel," *Chen v. Gonzalez*, 420 F.3d 707, 710 (7th Cir. 2005), Islam was counseled when he filled out his application. And an IJ may consider the omission of significant events of persecution in an asylum application that are later described during live testimony, if the omission cannot be easily explained. *See Hassan v. Holder*, 571 F.3d 631, 637 (7th Cir. 2009); *Adekpe v. Gonzales*, 480 F.3d 525, 531 (7th Cir. 2007); *Chen*, 420 F.3d at 710. Islam's explanation for leaving out all allegations of persecution in his asylum application—a fear of telling his lawyer—was undermined by his 2013 hearing testimony in which he said that he had told his lawyer "that these things happened to me." The IJ was not required to accept these conflicting

explanations.[2] *See Zeqiri v. Mukasey*, 529 F.3d 364, 371 (7th Cir. 2008); *Feto v. Gonzales*, 433 F.3d 907, 911 (7th Cir. 2006); *Balogun v. Ashcroft*, 374 F.3d 492, 504–06 (7th Cir. 2004).

Islam next argues that the Board failed to explain how the inconsistencies identified by the IJ go to the heart of his claim. Although he does not articulate it as such, we infer that he is arguing that the IJ's erroneous application of the REAL ID Act was not, as the Board concluded, harmless. The REAL ID Act loosened the standard for assessing an asylum applicant's credibility: For claims filed before the passage of the Act, an IJ's adverse credibility finding could be supported only by inconsistencies that go to the heart of the applicant's claim; for claims filed after the Act, an adverse credibility finding could be supported by any non-trivial inconsistency in the applicant's story, whether or not it goes to the heart of his claim. *See Tawuo v. Lynch*, 799 F.3d 725, 727 (7th Cir. 2015); *Hassan*, 571 F.3d at 637; *Adekpe*, 480 F.3d at 531; *San Kai Kwok v. Gonzales*, 455 F.3d 766, 769 (7th Cir. 2006). Essentially, Islam is arguing that the inconsistencies identified by the IJ do not support an adverse credibility finding under pre-REAL ID Act law because they do not go to the heart of his claim, and thus the IJ's erroneous application of the REAL ID Act was not harmless.

As the government points out, the IJ should not have applied the REAL ID Act to Islam's claim, but any error was harmless because the adverse credibility finding was supported under either standard. Even under the more stringent pre-REAL ID Act standard, the IJ's adverse credibility determination is supported by one major discrepancy that goes to the heart of Islam's claim: the inconsistency between Islam's initial asylum application, in which he did not allege that he suffered any persecution, and his later testimony alleging extensive mistreatment.

Islam focuses on another inconsistency identified by the IJ that he says does not go the heart of his claim: whether after his 2004 arrest he was seen by a doctor or whether he was seen by a doctor at an in-patient clinic. But we review the Board's decision, and the Board did not rely on this inconsistency in upholding the IJ's credibility determination. We note, however, that the Board did rely on some trivial inconsistencies: Whether the 2004 arrest happened on March 10 or March 14, and whether Islam was held overnight and released at noon two days later or arrested at

---

[2] At oral argument Islam's attorney put forth two additional reasons for the omission: that there was not enough room to write in his allegations on the form and that Islam was not proficient in English. But Islam did not mention these reasons when the IJ asked him about the omissions, nor do the reasons explain why Islam did not tell his attorney about the alleged mistreatment.

midnight, held for "approximately" 24 hours, and released the next day at noon. *See, e.g.*, *Adekpe*, 480 F.3d at 531 (concluding that discrepancies about whether university student's meeting occurred on campus or "at home," whether meeting had 13 or 20 participants, and what precisely happened to an informant, did not concern basic core of applicant's claim that he was beaten for political activities).

Nevertheless, Islam's omission of any allegations of persecution in his initial asylum application is sufficient, on its own, to support the IJ's adverse credibility finding. *See Tawuo*, 799 F.3d at 727–29 (discussing the highly deferential standard this court uses in reviewing an IJ's credibility findings). Therefore, we DENY the petition for review.