NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued May 1, 2007
Decided July 13, 2007

**Before**

Hon. KENNETH F. RIPPLE, *Circuit Judge*

Hon. DANIEL A. MANION,  *Circuit Judge*

Hon. ANN CLAIRE WILLIAMS,  *Circuit Judge*

| | |
|---|---|
| No. 06-3433 | Petition for Review of an Order of the Board of Immigration Appeals |
| ALVARO H. LEYVA, *Petitioner*, | No. A97-102-354 |
| *v.* | |
| ALBERTO R. GONZALES, United States Attorney General, *Respondent*. | |

**O R D E R**

Alvaro Hernando Leyva, a former civilian accountant for the Colombian Navy, and his wife and three children seek review of the final decision of the Board of Immigration Appeals that denied them asylum and relief under the Convention Against Torture.  We deny the petition for review because substantial evidence does not compel a finding that Leyva suffered persecution on account of political opinion or a sufficient likelihood of torture.

I.

Alvaro Hernando Leyva is a citizen of Colombia, as are his wife, Eda Jannette, and their three children. Leyva began working for the Colombian Navy in 1991 as a civilian accountant. His troubles began in 1998, when he discovered accounting irregularities that benefitted Captain German Sahid-Castano. Sahid threatened him not to report the irregularities, stating that "the eagles kill the doves." Leyva interpreted this remark as a threat against his reporting the irregularities and a reference to his being a "a Christian or a follower of [the] Mennonite way." In spite of the threat, Leyva reported the irregularities within the department to the auditors. The irregularities were leaked to the press, and Sahid subsequently lost his position with the Navy after the corruption became more widely exposed. Leyva received a transfer to a different department.

Leyva later was stationed on a vessel, the *Gloria*, for six months. Before embarking, several superior naval officers threatened Leyva in late 2000 about reporting any irregularities. Instead, they told him to be prepared to "clean things up if necessary" with the accounting while aboard. Once aboard, Leyva discovered another accounting problem, in which Lieutenant Martin-Orduz misused funds. Orduz threatened Leyva about the discovery, locked him in his office for an unknown duration on one day, and accused him of working for counter-intelligence. When Leyva reported the incident to the captain, the captain instructed Leyva not to get involved. Leyva did not speak to the press about any of the corruption.

Leyva's wife also received threats stemming from her husband's discovery and reporting of the accounting irregularities, including written cards suggesting her husband's death while he was aboard the *Gloria*, threatening telephone calls, strangers approaching her at work and around the family home, and strangers asking the children and those living in their neighborhood about the family's schedules and details. Leyva also continued to receive various verbal threats from superiors.

The most serious incident occurred on February 22, 2002, when two armed men in a vehicle approached Leyva while he was waiting at a bus stop and ordered him into their vehicle. They placed a bag over his head, beat him with their fists and the butts of their guns, and burned his wrists with an unidentified chemical. The men warned him not to discuss the corruption further and threatened him and his family. Leyva believed that the men's accents indicated they were from the coast, and therefore members of a paramilitary force, which is primarily recruited from the coast. Leyva claims that his superior officers had connections with the paramilitary forces and sent the paramilitary to threaten him.

After the detention, Leyva reported the incident to his superiors. Two of his superiors advised leaving the country for a time, and Leyva took a leave of absence from his position. He arrived in the United States on April 17, 2002. His wife and children joined him less than two months later. Notably, he only planned to visit, but applied for asylum on April 10, 2003, based on the encouragement of friends.

After a hearing, the Immigration Judge (IJ) denied Leyva's request for asylum, withholding of removal, and relief under the Convention Against Torture (CAT). The Board of Immigration Appeals (BIA) affirmed the IJ's decision, supplementing it with its own reasoning. Leyva now petitions this court to review the denial of asylum and relief under the CAT, but does not seek withholding of removal.

## II.

We review the denial of asylum under "the substantial evidence standard." *Feto v. Gonzales*, 433 F.3d 907, 910-11 (7th Cir. 2006) (citation omitted). Under this deferential standard, "we require only that the decision be supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Gjerazi v. Gonzales*, 435 F.3d 800, 807 (7th Cir. 2006) (citation and internal quotation omitted). This standard is in accord with the statutory requirement that "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). If, as in this case, "the BIA adopts the IJ's decision while supplementing the decision with its own reasoning, the IJ's decision, as supplemented by the BIA's decision, becomes the basis for review." *Gjerazi*, 435 F.3d at 807 (citation omitted).

We begin with Leyva's claim for asylum. Asylum may be granted "to aliens who apply for asylum in a timely fashion, meet certain procedural requirements, and qualify as refugees." *Sosnovskaia v. Gonzales*, 421 F.3d 589, 593 (7th Cir. 2005) (citing 8 U.S.C. § 1158(b)(1)(A)). "A 'refugee' is defined as a person who is unable or unwilling to return to the country of her nationality because of 'persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . .'" *Id.* (quoting 8 U.S.C. § 1101(a)(42)(A)). In this case, Leyva claims persecution based on political opinion. Leyva bears the burden of demonstrating that he has suffered past persecution or a well-founded fear of future persecution on account of his political opinion. *Id.* (citing 8 C.F.R. § 208.13(a)).

Although the statute does not define "persecution," we have previously explained that persecution "may include detention, arrest, interrogation,

prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, [] torture, [or] behavior that threatens the same . . . ." *Gjerazi*, 435 F.3d at 808 (citation and internal quotations omitted). Persecution "must rise above the level of 'mere harassment' and must result from more than unpleasant or even dangerous conditions in [the] home country." *Nakibuka v. Gonzales*, 421 F.3d 473, 476 (7th Cir. 2005) (citation omitted). We previously analyzed a detention lasting three days, in which the petitioner was denied food and his face beaten. *Dandan v. Ashcroft,* 339 F.3d 567, 573-74 (7th Cir. 2003). We concluded:

> when we look at the evidence of the severity of Dandan's single detention, we cannot say that we are compelled to find that he was subject to past persecution. This is a high standard and one that is properly difficult to meet without powerful and moving evidence. The issue is difficult to resolve, and we find it quite serious that Dandan was detained, beaten and deprived of food for three days. But the sort of specific information that would compel a finding of persecution has not been presented. We know only that the detention was without food, was three days long and that he was beaten to the extent that his face became "swollen." While it is distasteful to have to quantify suffering for the purposes of determining asylum eligibility, that is our task. A standard of review that requires our being compelled to reach a conclusion contrary to the BIA means that we necessarily search for specifics, not generalities. Significant in our analysis is the obvious fact that knowledge of the specific circumstances of Dandan's detention was entirely within his control. Dandan's case for past persecution, with all its procedural ramifications that we have noted, rests wholly upon the specific circumstances of a single aggravated detention–circumstances he alone could have, but failed to provide. Because Dandan bears the burden of demonstrating that his detention rises to the level of persecution, we must hold against him the failure to provide sufficient specifics to compel our assent. A three-day interrogation resulting in a "swollen" face does not compel us to conclude that the BIA was incorrect.

*Id.* (emphasis omitted). In this case, Leyva claims a beating lasting one day and resulting in burns on his wrists. Even when combined with the verbal threats to Leyva and his family over time and the brief detention on the ship, the treatment does not rise above the level of harassment. In *Dandan*, the applicant similarly faced additional threats to his family and harm when "the family's house was shelled and partially destroyed, and that as a result, he and his family went from shelter to shelter" for a two month period. *Id.* at 571. As in *Dandan*, we are not compelled by the evidence to conclude that the BIA erred in finding that Leyva fails to demonstrate that he suffered persecution.

Since he fails to demonstrate past persecution, Leyva is not entitled to a rebuttable presumption of future persecution. *See Gjerazi*, 435 F.3d at 808 ("[a]n applicant who successfully proves past persecution is presumed to have a well-founded fear of future persecution—a presumption that the government can rebut by demonstrating a change in the conditions in the applicant's homeland." (citations omitted)). Nonetheless, Leyva may "demonstrate a well-founded fear of future persecution if his fear is subjectively genuine and objectively reasonable in light of credible evidence." *Id.* (citations omitted). Even assuming, as the BIA did, that Leyva subjectively fears future persecution, his fear is not objectively reasonable in light of the evidence. As the BIA explained, "given the passage of time since [Leyva's] last encounter with paramilitaries, and insofar as he is no longer an employee of the finance department of the Colombian Navy, he is not in a position that would cause him to be targeted for any purpose by these same, or any other paramilitaries." Leyva bears the burden to demonstrate that his fear is objectively reasonable. 8 U.S.C. § 1158(b)(1)(B). Since neither the testimony nor the documentary evidence compels a finding to the contrary, we find no error in the BIA's conclusion that Leyva fails to demonstrate an objectively reasonable fear of future persecution.

Furthermore, even if the acts Leyva and his family suffered amounted to past persecution or a well-founded fear of future persecution, Leyva fails to demonstrate that the persecution occurred "on account of" a political opinion. We have stated that "[a] political opinion is one that is expressed through political activities or through some sort of speech in the political arena." *Li v. Gonzales*, 416 F.3d 681, 685 (7th Cir. 2005) (citations omitted). For example, "[s]omeone who campaigns against the government and urges the voters to throw the rascals out is engaged in political speech," as is "someone who writes an op-ed piece or otherwise urges the people to rid themselves of corrupt officials." *Musabelliu v. Gonzalez*, 442 F.3d 991, 995 (7th Cir. 2006). Leyva did not engage in any of these classic political activities.

This does not end our analysis, however, because this court has acknowledged that "[w]histle-blowing about public corruption can be a form of political opinion." *Id.* (citations omitted). Leyva implies that he was a whistle-blower who tried to expose improper uses of government funds. His claim falls short because in his investigation into corruption he "did not take [his evidence of corruption] to the public in quest of a political decision." *Id.* at 996 (citations omitted). Instead, Leyva pursued an investigation within the chain of command in the Navy by reporting his findings to auditors and to his superiors. *See id.* (noting that the alien "made his views known within the chain of command, as part of his official duties," which was insufficient to constitute an expression of political opinion). Additionally, we previously noted that "[i]t is an open question even in the

United States whether the first amendment gives public officials a right to be free of retaliation when they speak within an agency's hierarchy on an issue of public concern, as part of their duties." *Id.* (noting that the Supreme Court had granted certiorari in *Garcetti v. Ceballos*, 543 U.S. 1186 (2005), to address this issue). Subsequently, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 126 S. Ct. 1951, 1960 (2006). As we previously noted, the holding in *Garcetti* "reinforces the characterization of [Leyva's] conduct within his employment [with the government] as non-political speech; it would be implausible to offer broader protection for speech to an alien under the immigration laws than is provided to citizens under the First Amendment." *Pavlyk v. Gonzales*, 469 F.3d 1082, 1089 (7th Cir. 2006). As a factual matter, Leyva has not demonstrated that the incidents he suffered were on account of political opinion. *Musabelliu*, 442 F.3d at 996. Accordingly, he fails to qualify as a refugee entitled to asylum. Because his wife's and children's claims are derivative of his own, they also do not qualify for asylum. Furthermore, since Leyva and his family are not entitled to asylum, even if they had sought withholding of removal, it would not be available to them. *Jamal-Daoud v. Gonzales*, 405 F.3d 918, 925 (7th Cir. 2005) ("Because the standard of proof for withholding of removal is higher than that needed to establish eligibility for asylum, the failure to sustain the burden of proof for asylum necessarily precludes eligibility for withholding of removal." (citation omitted)).

Leyva next claims that he and his family are entitled to protection under the Convention Against Torture (CAT). We again review the denial of relief under the substantial evidence standard, analyzing whether "the record compels a contrary result." *Mabasa v. Gonzales*, 455 F.3d 740, 744 (7th Cir. 2006) (internal quotation and citations omitted). Relief under the CAT does not have to be on account of political opinion to qualify for relief. Instead, to obtain relief under CAT, Leyva must show that "it is more likely than not that if removed to [Colombia], he will be subject to torture." *Boyanivskyy v. Gonzales*, 450 F.3d 286, 292 n.3 (7th Cir. 2006) (citing 8 C.F.R. § 208.16(c)(2)). The regulations define torture as:

> [A]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering

is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1). Showing a likelihood of torture is a "more stringent" standard than is required to demonstrate persecution required to qualify for asylum. *Gomes v. Gonzales*, 473 F.3d 746, 757 (7th Cir. 2007) (citation omitted). Since, as discussed above, Leyva "fails to meet the more lenient burden of proof for asylum, he cannot establish that he is . . . eligible for protection under the Convention Against Torture." *Hussain v. Gonzales*, 424 F.3d 622, 630 (7th Cir. 2005) (citations omitted).

## III.

Because the evidence does not compel a finding of past persecution or a well-founded fear of future persecution and because, even if the incidents had risen to the level of persecution they were not on account of political opinion, Leyva is not entitled to asylum. Similarly, because Leyva fails to demonstrate a likelihood of torture, he is not entitled to relief under the Convention Against Torture. His family's derivative petitions likewise fail. Accordingly, we DENY the petition for review.